FILED
JAMES BONINI
CLERK

08 NOV 20 PM 12: 12

U.
SOUTH
EAST



# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **MARK BLASKO**<br>11934 Gray Eagle Drive<br>Fishers, IN 46037<br><br>And<br><br>**EGLAEH BLASKO**<br>11934 Gray Eagle Drive<br>Fishers, IN 46037<br><br>Plaintiffs,<br><br>v.<br><br>**PETLAND, INC.**<br>c/o Statutory Agent<br>Matthew S. Schmidt<br>72 N. Paint St.<br>Chillicothe, Ohio 45601<br><br>And<br><br>**HUNTE KENNEL SYSTEMS &**<br>**ANIMAL CARE, INC.**<br>c/o Registered Agent John R. Lightner<br>1949 E. Sunshine, Ste 2-102<br>Springfield, Missouri 65804<br><br>And<br><br>**HUNTE DELIVERY SYSTEM, INC.**<br>c/o Andrew Hunte<br>121 N. Royhill Blvd.<br>Goodman, Missouri 64843<br><br>Defendants. | CASE NO.: **2:08 cv 1105**<br><br>JUDGE: **JUDGE GRAHAM**<br>**MAGISTRATE JUDGE ABEL**<br><br>**COMPLAINT** |

Now come Plaintiffs Mark and Eglaeh Blasko (hereinafter collectively referred to as "Plaintiff,"[1]), and for their Complaint against Defendants Petland, Inc. (hereinafter referred to as "Petland"), Hunte Kennel Systems & Animal Care, Inc., and Hunte Delivery System, Inc. (hereinafter collectively referred to as "Hunte"), state as follows:

## PARTIES

1.      At all times relevant, Plaintiff is a United States citizen domiciled in the state of Indiana at 11934 Gray Eagle Drive, Fishers, Indiana 46037.

2.      At all times relevant, Petland is an Ohio corporation that maintains its principal place of business at 250 Riverside Street, Chillicothe, Ohio 45601. Petland is in the retail pet industry, specializing in the sale of pets and pet supplies. In addition, Petland franchises its pet supply business to franchisees both within, and without, Indiana.

3.      At all times relevant, Hunte's principal place of business is in Missouri. Hunte is in the business of supplying puppies to pet stores and, for all relevant purposes here, is a preferred supplier of puppies to Petland, and supplied the puppies that constitute the subject matter of the allegations against Hunte in this Complaint.

---

[1] For legal purposes, Eglaeh Blasko, as Mark Blasko's wife, was required to execute the franchise agreement which forms the basis of Plaintiffs' Complaint. However, because Mrs. Blasko was not actively involved with the franchise (or in the negotiations leading up to the franchise), the term "Plaintiff," as used herein, generally refers to Mr. Blasko in the context of factual allegations.

## JURISDICTION & VENUE

4.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1332(a)(1), in that this is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

5.     This Court also has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1331, in that this is a civil action arising under the laws of the United States, specifically, the Sherman Act (15 U.S.C. §1), the Clayton Act (15 U.S.C. §15), and the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §1962(C)).

6.     With respect to invoking this Court's jurisdiction pursuant to 28 U.S.C. §1331, this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

7.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(3), in that Defendant Petland may be found in this judicial district, having a principal place of business at 250 Riverside Street, Chillicothe, Ohio 45601.  Moreover, Plaintiff and Petland specifically contractually consented to suit in this District in a forum selection clause in the parties' Franchise Agreement, §28, page 36.  (*See* Franchise Agreement attached hereto as Exhibit A, and referred to hereinafter as "Franchise Agreement.")

## FACTS

8.     Plaintiff incorporates and realleges the allegations of paragraphs 1 through 7 as if fully set forth herein.

9.     In or around early 2005, in search of an investment opportunity, Plaintiff came across the prospect of investing in a Petland franchise.

- 3 -

10.     In or around the spring/summer 2005, Plaintiff contacted Petland to inquire about investing in a Petland franchise.   Plaintiff spoke with Jim Whitman, in the Franchise Development Department, who advised Plaintiff to attend an event known as "discovery day," the purpose of which was to provide information to potential franchisees about the possibility of acquiring a Petland franchise.

11.     In the communications/events that would follow, and as will be more fully described below, Petland made numerous false, inaccurate, misleading, and material misrepresentations regarding the Petland franchising scheme, and also with respect to Plaintiff's particular Petland store.

12.     While attending Petland's "discovery day," Plaintiff was informed by Jim Whitman that Petland's failure rate for franchisees is "less than 2%." (Upon information and belief, Petland's failure rate far exceeds 2%.)

13.     At the "discovery day," Jim Whitman further explained to Plaintiff that "the only people who fail are those who don't follow the system," and further making various comments so as to imply that "if you have a brain in your head, you will succeed."

14.     However, and as Plaintiff came to discover, following Petland's "system" will lead to one result, and one result only, for new start-up franchises – failure.

15.     Also at the "discovery day," Jim Whitman quoted Plaintiff a price for a start-up franchise of $600,000, which, after further inquiry by Plaintiff and subsequent discussions/negotiations, later became $900,000 (*a $300K increase*).

16.     On July 17, 2005, and performing his due diligence, Plaintiff flew to Orlando to attend a Petland trade show.

- 4 -

17.     At said trade show, and on the afternoon of July 18, 2005, Plaintiff met with Petland's Greg Hudson (COO or VP of Operations) to further discuss Petland's franchising opportunities. Plaintiff brought his notebook, so as to take notes, when Mr. Hudson informed Plaintiff that they could not discuss franchising if Plaintiff was going to take notes of their conversation.

18.     Plaintiff put away his notebook, and was then told by Greg Hudson that "you will make a great franchisee!" Plaintiff wanted to talk numbers, and told Mr. Hudson that he was currently salaried at $150,000 per year, and thus desired/needed to make a similar income. Mr. Hudson responded that "you will make *at least* $100K. In fact, we don't have many successful franchisees making less than 6 figures." Mr. Hudson continued: "You can easily do $200K to $300K, and gross upwards of $3,000,000."

19.     After the trade show, and continuing his due diligence, Plaintiff wanted to see some hard numbers on paper. Jim Whitman responded that Petland could not provide Plaintiff with any hard data, instead sending to Plaintiff a *blank* business spreadsheet on or around July 27, 2005. Jim Whitman then provided Plaintiff with some numbers over the phone, essentially providing Plaintiff with the types of financials that would fraudulently induce Plaintiff into building a Petland franchise. The numbers provided by Mr. Whitman were arbitrary, and seemed to have been pulled out of thin air. (Of course, Mr. Whitman's numbers showed great profits on the way for Plaintiff's franchise.) After Mr. Whitman provided these fake numbers, and after Plaintiff incorporated them into the business worksheet, Mr. Whitman proclaimed, "see – you'll be a great franchisee." (Upon information and belief, Petland provided Plaintiff with these financials over the phone, rather than providing them in writing, to seemingly cover its

- 5 -

tracks for when Plaintiff, or any potential franchisee, for that matter, would finally discover the falsity and inaccuracy of said projections, thereby discovering the fraud perpetrated by Petland.)

20.     Plaintiff was eventually quoted a $900,000 price-tag for Plaintiff's start-up franchise, despite Jim Whitman's earlier quote of $600,000.

21.     Plaintiff expressed some concern and hesitation over spending $900,000 for the franchise, to which Mr. Whitman responded that Plaintiff "should not be scared of that number at all." Mr. Whitman reasoned that the Indianapolis area was a "huge opportunity for Petland," and that "you'll have *one of the top stores in the entire chain and be first in line to open additional stores – you'll be an extremely wealthy individual.*"

22.     Plaintiff then expressed concerns about his territory, and whether Petland would put up another store in the area. Jim Whitman responded that he was the "gatekeeper," and that *he* decides who gets a franchise. He continued: "Indianapolis is a huge city – we would never put another franchise next to you; it just doesn't make sense."

23.     Unaware of the falsity, inaccuracy, misleading nature, and materiality of Petland's numerous misrepresentations, Plaintiff, nevertheless, was induced by Petland to enter into a franchise agreement on October 16, 2005. (*See* Franchise Agreement, attached hereto as Exhibit A).

24.     Dale Davis, the Petland employee responsible for working with franchisees to obtain the necessary financing, sent Plaintiff a spreadsheet, via e-mail, containing projected revenues of $1.9 million for the first year, $2 million for the second year, and $2.1 million for the third year. Upon seeing such optimistic figures, Plaintiff then telephone Jim Whitman to ask "will I *really* do this much?" Mr. Whitman responded, "Yes. These numbers are conservative." Mr. Whitman further explained that there was an exceptional number of "poor operators" in the

- 6 -

chain that drove the average down, and that the owner of Petland, Ed, did a poor job of policing this. Plaintiff was assured that Frank, the new president, was working hard to remove these franchisees and that the true average was much closer to $2 million in annual sales. Mr. Whitman reassured Plaintiff that Mr. Whitman had been in the business a long time, and he guaranteed that Plaintiff would be an "above-average" franchisee, while noting that he was an "expert" in such matters.

25.     Shortly thereafter, and performing due diligence, Plaintiff contacted Greg Hudson with a very important question: "But what if I do *less than* $1.9 million?" Mr. Hudson then responded, "Don't worry – you won't go out of business. We will work with you to cut your expenses if that happens."

26.     However, upon information and belief, at the time of Plaintiff's negotiations with Petland, the average Petland store did $1.2 million in annual revenues. Annual revenues of $1.9 million would have made Plaintiff one of Petland's *top* (i.e. highest-selling) franchisees.

27.     Obviously, and so as to induce Plaintiff into starting up a Petland franchise, Petland doctored the financials to look so enticing and profitable, that Plaintiff simply could not pass up this investment opportunity.

28.     Dale Davis then submitted all of these documents to UPS Capital, which approved financing of $750,000. Plaintiff put forth $133,000 of his own funds.

29.     On aspect of the start-up cost was the purchase of furniture, fixtures, equipment, and the costs of the build-out, which totaled approximately $750,000. However, upon information and belief, the true cost of the furniture/fixtures/equipment/build-out was much, much less than $750,000, with Petland pocketing the difference. For example, to install the HVAC system, Petland contracted with a vendor in Petland's home city of *Chillicothe, Ohio*,

which is several hundred miles from Indianapolis. In all likelihood, and upon information and belief, Petland probably receives a nice little kickback from said vendor.

30. Moving forward, in November of 2005, a representative from Petland's real estate department came to the area to find a location for Plaintiff's franchise. Over Plaintiff's objection, Plaintiff's franchise went up at 14641 US 31 North, Suite E1, Carmel, IN 46302.

31. Plaintiff informed the Petland representative that the rent was too expensive (in excess of $11,000 per month), and that Plaintiff did not like the location, as it did not even face the main road.

32. In response, the Petland representative informed Plaintiff that "you don't want it to face the street. You want it to face the inside of the plaza so that plaza-shoppers can see it."

33. Additionally, Plaintiff asked about the pet store that was located across the street, to which Petland responded, "Don't worry – you're in a different market than them."

34. To prepare himself for operating the Petland franchise, Plaintiff attended regular training sessions, during which Petland representatives continually stressed that every dollar of stocked inventory translates into a dollar of revenue *per month*.

35. Prior to the franchise's grand opening (of August 5, 2006), Plaintiff received its first batch of puppies (approximately 60-65 puppies) from Defendant Hunte. (Per the Franchise Agreement, Plaintiff was required to purchase puppies from Hunte.)

36. More than half of them were sick when they arrived, diagnosed by Plaintiff's veterinarian to have a wide range of conditions, including parvo, pneumonia, respiratory infections, and ringworm.

37. These sick puppies required extensive medical treatment, by which Plaintiff incurred thousands and thousands of dollars of unexpected expense.

- 8 -

38. Further, sick puppies continued to arrive from Hunte.

39. Plaintiff then called Petland and Hunte, both of which refused to rectify the situation at first.

40. Finally, after numerous calls by Plaintiff, Hunte agreed to send a truck to Plaintiff's store to retrieve the sick puppies. However, and contrary to Hunte's "guarantee," Hunte only reimbursed Plaintiff with a small portion of his veterinarian expense, instead claiming that "your vet is charging too much." (However, Plaintiff had already negotiated a 50-75% discount with his veterinarian, and had still spent thousands and thousands of dollars on vet bills.)

41. Additionally, Plaintiff paid for all of his customers' veterinary bills (which cost *substantially more* than the pets themselves).

42. Furthermore, Plaintiff's reputation was severely damaged, although having only been open for a couple of months. Plaintiff received numerous telephone calls and in-store complaints from angry customers.

43. Plaintiff went to Petland for assistance after months of losing money. Petland's only response: "You need to do more sales." Aside from stating the obvious, Petland offered no support whatsoever, and refused to send representatives to assist with the store.

44. In the first year, Plaintiff had done $1.5 million in revenues, yet still lost over $100,000.

45. In or around the fall of 2007, Juan Lopez, a potential Petland franchisee, inquired about Petland franchising from Plaintiff. In January, 2008 Plaintiff and Mr. Lopez entered into negotiations for the sale and purchase of Plaintiff's franchise.

- 9 -

46.     Plaintiff, pursuant to the Franchise Agreement's Assignment Clause, contacted Petland so as to effect a sale to Mr. Lopez.

47.     Jim Whitman told Plaintiff that Petland would assist Plaintiff in closing the deal with Mr. Lopez for a premium price, while at the same time inferring that Mr. Whitman's assistance in this regard was contingent upon Plaintiff re-investing this money in another Petland franchise.

48.     Plaintiff informed Mr. Whitman that he wanted to get out of this business, *for now*, and that he wanted to move forward with the sale to Mr. Lopez.

49.     Plaintiff was then telephoned by Brian Stephens, formerly of UPS Capital and now with another firm doing business with Petland, who informed Plaintiff that the expenses (and specifically referring to the high rent and loan payment), *as submitted by Petland*, would not support an approval of Mr. Lopez' loan application. Mr. Stephens said that the expenses and loan payment, *as submitted by Petland*, were too high, and that Juan "won't make it." (Interestingly enough, Plaintiff's loan application had been approved for that *very same store*.)

50.     Dale Davis, of Petland, telephoned Plaintiff to inform him that Juan Lopez' financing was not approved.

51.     Facing a financial crisis, and unable to continue operations, Plaintiff was forced to shut down the store in July 2008.

52.     Shortly thereafter, UPS Capital took back the store and re-sold most of the assets.

53.     Mr. Lopez, who had still been eagerly pursuing the store and attempting to work with UPS Capital to obtain the necessary financing – suddenly informed UPS Capital that he was no longer interested in purchasing the store. Upon information and belief, Petland intervened, and told Mr. Lopez that it could help him acquire the store for much less then he would do on his

- 10 -

own, thereby ruining any chance of a settlement between Plaintiff and UPS Capital. (Facing a foreclosure by UPS Capital, and in hopes of obtaining more than pennies on the dollar for his store, Plaintiff was trying to negotiate the sale with Juan Lopez.)

54.     Petland then paid UPS Capital $75,000 to acquire the store.

55.     Upon information and belief, Petland also re-negotiated the rent to a substantially lower rate than was originally negotiated for Plantiff.

56.     Then, Petland *re-sold the franchise to Juan Lopez*, who re-opened the store in October 2008.

## CLAIMS FOR RELIEF

### COUNT I—ILLEGAL TYING UNDER §1 OF THE SHERMAN ACT (15 U.S.C. §1) AS TO DEFENDANT PETLAND

57.     Plaintiff incorporates and realleges the allegations of paragraphs 1 through 56 as if fully set forth herein.

58.     There exists a relevant product market of pet store franchises, in which Petland maintains substantial market power.   Specifically, Petland was ranked number 192 in Entrepreneur Magazine's Annual Franchise 500 for 2007.  Petland also achieved a ranking of 140 in that magazine's list of America's Top Global Franchises.  Petland was the only full-service pet store franchise listed among Entrepreneur's Franchise 500 top retail pet franchises in 2007.  In addition, Petland was ranked number 182 in the annual "Top 200" franchisors in the United States as determined by Franchise Times magazine.  Petland franchises are located in over 30 states, as well as in Canada, Chile, Japan, and South Africa.

59. There also exists a relevant product market for the related goods and services associated with the operation of a Petland franchise, including pets, pet supplies, pet food, and equipment ("Essential Goods").

60. Plaintiffs were induced to purchase the Petland franchise in reliance on Petland's overwhelming market power, monopoly power, and/or economic power. As a result, Plaintiffs were subsequently forced to purchase and accept only those Essential Goods supplied by Petland and Petland's "Approved Suppliers." Specifically, Plaintiffs' purchasing abilities were severely limited in the following ways (list is not all-inclusive):

a) Plaintiffs could only purchase computer hardware and software (including the POS) specified by Petland;

b) Plaintiffs were required to have their financial reporting done by Petland only (for compensation) for the first year;

c) Plaintiffs could only purchase the Essential Goods from Petland and from approved vendors, which includes Defendant Hunte;

d) the inventory at Plaintiffs' store was required to consist of at least 75% of Petland-branded products.

61. Petland receives a direct economic benefit from this tying arrangement. Specifically, upon information and belief, the approved suppliers of Essential Goods provide Petland with a "kickback." For example, it is believed that Loveland Pet Products (one of Petland's approved suppliers) provides a 2% kickback.

62. Petland's tying of its franchises to the Essential Goods of Petland and its approved vendors imposes an unreasonable restraint upon a substantial quantity of commerce

- 12 -

and is therefore *per se* unlawful and in violation of Section One of the Sherman Act, 15 U.S.C. §1, and has caused damages to Plaintiffs.

63. Alternatively, if Petland's tying conduct is not *per se* unlawful, it is unlawful under the rule of reason, on the basis that the anticompetitive consequences of Petland's conduct outweigh any pro-competitive effects thereof. Petland's conduct impedes the ability of other vendors and suppliers of pet-related products to engage in competition with Petland and Petland's "approved suppliers" and to provide higher-quality products at lower costs. The resulting effect is that the consumer pays a higher price for the product. No pro-competitive justification exists for this conduct.

64. As a direct and proximate result of Petland's conduct as set forth above, Plaintiffs have suffered damages, and are entitled to treble damages and attorney's fees pursuant to 15 U.S.C. §15.

### COUNT II—CONSPIRACY TO COMMIT ILLEGAL TYING UNDER §1 OF THE SHERMAN ACT (15 U.S.C. §1) AS TO DEFENDANTS PETLAND AND HUNTE

65. Plaintiff incorporates and realleges the allegations of paragraphs 1 through 64 as if fully set forth herein.

66. Based on information and belief, Defendants Petland and Hunte entered into an agreement, conspiracy, or combination, whether express or implied, whereby Hunte is an "approved supplier" of certain Essential Goods for Petland franchises. (i.e. Hunte's products and/or services are "tied to" Petland's franchising.)

67. This agreement, conspiracy, or combination unreasonably restrains competition in that it impedes the ability of other vendors and suppliers of pet-related products to engage in

- 13 -

competition with Hunte and to provide higher-quality products at lower costs. The resulting effect is that the consumer pays a higher price for the product.

68.     This agreement, conspiracy, or combination causes injury to competition, as set forth above.

69.     As a direct and proximate result of this agreement, conspiracy, or combination, Plaintiffs have suffered damages, and are entitled to treble damages and attorney's fees pursuant to 15 U.S.C. §15.

## COUNT III—CIVIL RICO (18 U.S.C. §1962(C)) AS TO DEFENDANT PETLAND

70.     Plaintiff incorporates and realleges the allegations of paragraphs 1 through 69 as if fully set forth herein.

71.     Defendant Petland has violated 18 U.S.C. §1962(C) because it has conducted the affairs of an enterprise through a pattern of racketeering activity.

72.     The predicate crimes committed by Petland are mail fraud as defined by 18 U.S.C. §1341, wire fraud as defined by 18 U.S.C. §1343, and bank fraud as defined by 18 U.S.C. §1344.

73.     In violation of 18 U.S.C. §1341 and 18 U.S.C. §1343, Defendant Petland devised and effected a scheme to defraud the Plaintiff and to obtain money from Plaintiff by means of fraudulent pretenses. Specifically, Petland used fraudulent pretenses to induce Plaintiff into starting its Petland franchise, by knowingly and deliberately making false representations of fact, and/or omitting material true facts. (The specific allegations surrounding Petland's scheme to defraud are set forth in the "Facts" section above, and are incorporated fully herein).

74.     The execution of the scheme to defraud by Petland involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the

- 14 -

scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by Petland.  Specific instances include:  Plaintiff received shipments or deliveries of Essential Goods in connection with the Franchise Agreement, where said goods were delivered via the United States mails and/or private carriers; Plaintiff received facsimile transmissions in connection with its purchase of Essential Goods under the Franchise Agreement; Plaintiff received electronic mail messages from Petland relating to the Franchise Agreement; the Franchise Agreement provided for direct mailing campaigns through the United States mails.

75.    In violation of 18 U.S.C. §1344, Defendant Petland executed, or attempted to execute, a scheme to obtain money from a financial institution through false or fraudulent pretenses.  Specifically, in submitting financial documentation to UPS Capital on behalf of Plaintiff, and in hopes of obtaining financing for Plaintiff's start-up franchise, Defendant Petland doctored the financials, submitting false and inflated profit expectations to UPS Capital.  Plaintiff did not have involvement in doctoring said financials, as Petland's Dale Davis was in charge of working with UPS Capital in order to obtain financing for potential franchisees.

76.    The predicate acts committed by Petland as alleged herein constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5).  Specifically, the acts of mail fraud and wire fraud as alleged herein are related because they involve repeated instances of using the United States mails and interstate wire facilities while repeatedly making misrepresentations regarding Plaintiffs' Petland store.  Additionally, based on information and belief, other Petland franchisees across the United States, current and past, have also been victimized by this fraudulent scheme.  As to bank fraud, it is believed that Defendant Petland

overstates and inflates its financial projections in many other loan applications for franchisees, current and past.

77.     As a direct and proximate result of Petland's conduct as set forth above, Plaintiffs have suffered damages, and are entitled to treble damages and attorney's fees pursuant to 18 U.S.C. §1964.

### COUNT IV—VIOLATON OF OHIO ANTITRUST LAW, OHIO REV. CODE §1331.01 et seq. AS TO DEFENDANTS PETLAND AND HUNTE

78.     Plaintiff incorporates and realleges the allegations of paragraphs 1 through 77 as if fully set forth herein.

79.     The aforementioned practices of Defendants Petland and Hunte (set forth in Paragraphs 57-69) are in violation of Ohio antitrust law, Chapter 1331 of the Ohio Revised Code.

80.     Defendants Petland and Hunte are "persons," as defined at R.C. 1331.01(A).

81.     The conduct and activities of Petland and Hunte, as more fully set forth in the Paragraphs above, constitute a "trust," as defined at R.C. 1331.01(B).

82.     This trust is a combination of capital, skill, and/or acts by Petland and Hunte for the purposes of creating and/or carrying out restrictions in trade or commerce, as more fully set forth in the preceding Paragraphs.

83.     This trust is unlawful and void, pursuant to R.C. 1331.01.

84.     The Franchise Agreement, being in violation of R.C. 1331.01, is therefore illegal and void pursuant to R.C. 1331.06, and is thus unenforceable against the Arnolds.

85.     As a direct and proximate result of this illegal trust, Plaintiff has suffered damages, and is entitled to rescission of the Franchise Agreement, and is also entitled to

- 16 -

restitution of the money paid by Plaintiff to Petland pursuant to this agreement, and is entitled to treble damages and costs of suit, pursuant to R.C. 1331.08.

## COUNT V—FRAUD AS TO DEFENDANT PETLAND

86.     Plaintiff realleges and incorporates paragraphs 1 through 85 as if restated in full herein.

87.     As set forth in the "Facts" section above (incorporated fully herein), Petland made numerous false, inaccurate, misleading, and material misrepresentations regarding the Petland franchising scheme, and also with respect to Plaintiff's start-up investment, particularly.

88.     At the time these representations were made, Petland knew that they were false, or otherwise made them recklessly without knowledge of the truth.

89.     These representations and misrepresentations were made by Petland with the intention that they should be acted on by Plaintiff.

90.     These representations and misrepresentations were material to the transaction at hand (i.e. they were material to Plaintiff's decision to invest in a Petland franchise).

91.     Plaintiff, in fact and law, reasonably relied on the information provided by Petland, and acted upon Petland's representations and misrepresentations.

92.     Plaintiff suffered damages as a result of that reasonable reliance.

93.     By virtue of Petland's fraud, Plaintiff is entitled to rescission of the Franchise Agreement, to restitution of the money paid by Plaintiff to Petland for the Franchise Agreement, and for other economic and punitive damages as allowed by Ohio law.

## COUNT VI—FRAUD IN THE INDUCEMENT AS TO DEFENDANT PETLAND

94.     Plaintiff realleges and incorporates paragraphs 1 through 93 as if restated in full herein.

- 17 -

95.     As set forth in the "Facts" section above (incorporated fully herein), Petland made numerous false, inaccurate, misleading, and material misrepresentations regarding the Petland franchising scheme, so as to induce Plaintiff to invest in a Petland franchise.

96.     Petland, through its agents, servants, and/or employees, provided all of the above false information knowingly, and with the intent to fraudulently induce Plaintiffs into starting up a Petland franchise.

97.     But for this fraudulent information, Plaintiff would not have entered into the Franchise Agreement with Petland in the first instance.

98.     Plaintiff's reliance on Petland's false and fraudulent information is the direct and proximate cause of all of the Plaintiff's financial harm.

99.     By virtue of Petland's fraud, Plaintiff is entitled to rescission of the Franchise Agreement, and is also entitled to restitution of the money paid by Plaintiff to Petland pursuant to the Franchise Agreement, together with all other economic damages, and punitive damages, consistent with Ohio law.

## COUNT VII—BREACH OF EXPRESS CONTRACT AS TO DEFENDANT PETLAND

100.    Plaintiff realleges and incorporates paragraphs 1 through 99 as if restated in full herein.

101.    Petland's actions outlined above constitute breach(es) of express contract(s) between Plaintiff, and Petland.

102.    Specifically, Petland did not provide adequate business planning to Plaintiff.

103.    Petland only sent a representative to Plaintiff's store on a few occasions. Although titled a Business Improvement Consultant (BIC), said representative was merely a dog kennel expert, and knew *nothing* about running a retail business.

104.    Plaintiff, for months, attempted to receive marketing assistance from Petland's designated marketing partner.  However, Plaintiff's efforts were unfruitful, as Petland never provided such assistance.

105.    Plaintiff performed all of his obligations under the Franchise Agreement.

106.    By virtue of Petland's breach(es) of contract, Plaintiff is entitled to rescission of the Franchise Agreement, and is also entitled to restitution of the money paid by Plaintiff to Petland pursuant to the Franchise Agreement, together with all other economic damages consistent with Ohio law.

## COUNT VIII—BREACH OF IMPLIED CONTRACT AS TO DEFENDANT PETLAND

107.    Plaintiff realleges and incorporates paragraphs 1 through 106 as if restated in full herein.

108.    Petland's actions outlined above constitute breach(es) of implied contract between Plaintiff, and Petland.

109.    Specifically, Petland breached its agreement(s) with Plaintiff to perform and administer its (Petland's) contracts and agreements with Plaintiff in good faith, and which obligation of good faith and fair dealing is implied in every contract in Ohio.

110.    By virtue of Petland's breach(es) of contract, Plaintiff is entitled to rescission of the Franchise Agreement, and is also entitled to restitution of the money paid by Plaintiff to

Petland pursuant to the Franchise Agreement, together with all other economic damages consistent with Ohio law.

## COUNT IX—NEGLIGENT MISREPRESENTATION AS TO DEFENDANT PETLAND

111.    Plaintiff realleges and incorporates paragraphs 1 through 110 as if fully stated herein.

112.    Petland and its servants, agents, and/or employees, in the course of its business, supplied false and/or misleading information to Plaintiff in the guidance of opening and running Plaintiff's start-up franchise.

113.    Petland and Plaintiff, by virtue of the Franchise Agreement, had a special relationship whereby Petland was required to provide guidance and consultation to Plaintiff.

114.    Plaintiff justifiably relied upon the information provided by Petland and its agents, servants, and/or employees.

115.    Petland and its servants, agents, and/or employees failed to exercise due care and/or competence in obtaining and/or communicating necessary information to Plaintiff regarding the opening and running of Plaintiff's start-up franchise.

116.    Petland and its servants, agents, and/or employees intended to influence the actions of Plaintiff, and had reason to know that Plaintiff would rely on such false and/or misleading information.

117.    By virtue of Petland's negligent misrepresentation, Plaintiff is entitled to rescission of the Franchise Agreement, and is also entitled to restitution of the money paid by Plaintiff to Petland pursuant to the Franchise Agreement, together with all other economic damages, and punitive damages, consistent with Ohio law.

## COUNT X—VIOLATION OF IMPLIED AND EXPRESS WARRANTIES OF MERCHANTABILITY AS TO DEFENDANTS HUNTE

118.    Plaintiff realleges and incorporates paragraphs 1 through 117 as if fully stated herein.

119.    At all times material, defendants Hunte were merchants with respect to the puppies sold to Plaintiff as alleged in this Complaint.

120.    As set forth in the "Facts" section above (and incorporated fully herein), Hunte sold and delivered to Plaintiff sick puppies.

121.    Hunte expressly warranted to Plaintiffs that the puppies were healthy, and would be suitable for sale to the public. (Defendants Hunte should have in their possession a copy of the express warranty.)

122.    Hunte impliedly warranted to Plaintiff that the puppies were of merchantable quality, and fit for the ordinary purposes for which puppies are sold to the public.

123.    In connection with the sale of puppies to Plaintiff, Hunte knew the particular purpose for which the puppies were intended, knew that Plaintiff was relying on Hunte's skill and judgment to furnish suitable and healthy puppies, and thereby impliedly warranted that the puppies Hunte supplied to Plaintiff would be fit for their sale to the public.

124.    For all intents and purposes of/for the franchise, the puppies supplied by Hunte to Plaintiff, for sale to the public, were unmerchantable and, in some cases, worthless to them.

125.    By virtue of Hunte's breach of express and implied warranties, Plaintiff is entitled to economic damages, and punitive damages from Hunte, consistent with Ohio law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a) Rescind the Franchise Agreement between Plaintiffs and Petland;

b) Return to Plaintiffs any and all franchise fees, royalties, rent, purchase moneys, and/or other fees imposed by Petland, and/or other costs the Plaintiffs expended in furtherance of opening and operating the start-up franchise;

c) Enter judgment in favor of Plaintiffs and against Petland and Hunte for trebled compensatory damages, in an amount to be proven at trial, together with costs, prejudgment interest, and postjudgment interest;

d) Enter judgment against Petland and Hunte for punitive damages, and attorney fees; and

e) Award any additional relief deemed just and appropriate.

Respectfully submitted,

**LUPER NEIDENTHAL & LOGAN**
**A Legal Professional Association**

*/s/ Matthew T. Anderson*
_____
Gregory H. Melick (Ohio Bar 0065694)
Heather L. Melick (Ohio Bar 0068756)
Matthew T. Anderson (Ohio Bar 0082730)
1200 LeVeque Tower
50 West Broad Street
Columbus, Ohio 43215
Telephone:    (614) 221-7663
Fax:    (866) 345-4948
gmelick@lnlattorneys.com
hmelick@lnlattorneys.com
manderson@lnlattorneys.com
*Attorneys for Plaintiffs*

- 22 -